UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: <br><br> FRIEDMAN & WEXLER, LLC, <br><br> Debtor. <br><br>——————————————— <br><br> ILLINOIS STUDENT ASSISTANCE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> DAVID HERZOG, solely in his capacity as Trustee of the Estate of Friedman & Wexler, LLC, and as Trustee of the Estate of Norman Paul Wexler; and JOHN GIERUM in his capacity as Trustee of the Estate of Mitchell H. Wexler, <br><br> Defendants. | Case No. 11bk27030 <br><br> Chapter 7 <br><br><br><br><br> Adversary No. 12ap01057 <br><br><br><br> Judge Timothy A. Barnes |

TIMOTHY A. BARNES, Judge.

MEMORANDUM DECISION

The matter before the court arises out of the Motion for Summary Judgment dated January 22, 2013 (the "Motion") [Adv. Dkt. No. 22] of the Illinois Student Assistance Commission ("ISAC"), seeking summary judgment on all counts of the Complaint for Declaratory Judgment (the "Complaint") [Adv. Dkt. No. 1] against each of the above-captioned defendant trustees (the "Defendant Trustees"). The Complaint seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 determining that funds in certain identified accounts are not the property of any of the Defendant Trustees' bankruptcy estates pursuant to 11 U.S.C. § 541 but are held for the benefit of ISAC. The Complaint further seeks to have the funds exempted from any claims of the Defendant Trustees.

JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code, or arising in, or related to cases under title 11. 28 U.S.C. § 1334(b). District

1

courts may, however, refer such bankruptcy cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

Statutorily, a bankruptcy judge to whom a case has been referred may enter final judgment on any core proceeding arising under the Bankruptcy Code, or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). A request for declaratory judgment is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), arises in a case under title 11 and is specified as a core proceeding. 28 U.S.C. § 157(b)(2)(E); *In re Weinscheider*, 395 F.3d 401, 402 (7th Cir. 2005).

Accordingly, final judgment is within the scope of the court's authority.

## PROCEDURAL HISTORY

In considering the Motion, the court has considered the arguments of the parties at the May 15, 2013 hearing (the "Hearing") and has reviewed and considered the Motion itself, the various attached exhibits submitted in conjunction therewith (including the Statement of Uncontested Facts attached thereto as Exhibit 1), as well as all filings by the parties made in conjunction with this matter. In addition to the Motion, the court has found each of the following of particular relevance:

(1)  The Complaint [Adv. Dkt. No. 1];

(2)  Answer of David R. Herzog, as Chapter 7 Trustee for the bankruptcy estate of Friedman & Wexler, LLC ("F&W") to Complaint for Declaratory Judgment [Adv. Dkt. No. 11];

(3)  Defendant Trustee David Herzog's Answer on behalf of the bankruptcy estate of Norman Paul Wexler [Adv. Dkt. No. 12];

(4)  Answer of John E. Gierum, as Chapter 7 Trustee for the bankruptcy estate of Mitchell H. Wexler to Complaint for Declaratory Judgment [Adv. Dkt. No. 14];

(5)  Brief of David R. Herzog, as Chapter 7 Trustee for the bankruptcy estate of Friedman & Wexler, LLC, and Norman Paul Wexler and John Gierum, as Chapter 7 Trustee for the bankruptcy estate of Mitchell H. Wexler in opposition to Plaintiff's Motion for Summary Judgment [Adv. Dkt. No. 30];

(6)  Response of David R. Herzog, as Chapter 7 Trustee for Norman Paul Wexler and Friedman & Wexler, LLC, and John Gierum, as Trustee for Mitchell H. Wexler, pursuant to Fed. R. Bankr. P. 7056 and Local Rule 7056-2(A)(2) to ISAC Statement of Uncontested Facts [Adv. Dkt. No. 32]; and

(7)  Plaintiff's Reply to Response Brief filed by all Defendants [Adv. Dkt. No. 34].

The foregoing items together do not constitute an exhaustive list of the filings in the above-captioned adversary proceeding or the entire list of the filings the court has taken into consideration in this matter. Further, the court has taken judicial notice of the contents of the docket in this

matter. *See Levine v. Egidi*, No. 93C188, 1993 WL 69146 at *2 (N.D. Ill. March 8, 1993); *Inskeep v. Grosso (In re Fin. Partners)*, 116 B.R. 629, 635 (Bankr. N.D. Ill. 1989) (Sonderby, J.) (authorizing a bankruptcy court to take judicial notice of its own docket).

## FACTUAL HISTORY

From the foregoing review and consideration, and for the purposes of determining whether summary judgment is warranted, the court determines the salient facts to be as follows, and so finds that:

(1) From January 1, 1994 to June 30, 2006, the ISAC entered into an agreement (the "Service Agreement") with F&W for F&W to provide debt-collection legal services with respect to defaulted student loans that ISAC placed for collection. Under the terms of the Service Agreement, F&W was required to deposit all funds collected on behalf of ISAC's behalf into a segregated bank account maintained at an insured Illinois financial institution.

(2) During the term of the Service Agreement, F&W deposited collections on ISAC loan accounts in a trust account at U.S. Bank in Chicago, Illinois (the "U.S. Bank Trust Account"). The title of this account was "Lawyers Trust Fund of IL, Wexler & Wexler LLC, State of Illinois Account."

(3) On July 1, 2006, ISAC sent F&W a formal letter (the "Termination Letter"), instructing F&W to stop all collection activity on behalf of ISAC and to return all files and proceeds to ISAC.

(4) On July 14, 2006, F&W sent a response to the Termination Letter in which they demanded $13,043,014 in fees and asserted an attorneys' lien on the files and advised ISAC that F&W would continue to work the placed files until it had satisfied the liens.

(5) Thereafter, F&W continued to represent themselves as ISAC's attorneys, continued to collect loans that had been placed with F&W prior to the expiration of the Service Agreement and continued to endorse checks and accept other forms of payment they received from ISAC's accounts.

(6) On October 3, 2006, ISAC filed a six-count complaint (the "State Court Complaint") in the Circuit Court of Cook County, Illinois (the "State Court"), case no. 06 CH 20805 (the "State Action"), against Friedman & Wexler, LLC, *et al.* (collectively, the "State Court Defendants"). ISAC sought a temporary restraining order against F&W's unauthorized collection activities.

(7) On October 5, 2006, the State Court entered an order granting the temporary restraining order against the State Court Defendants (the "TRO"). The TRO enjoined the State Court Defendants from: holding themselves out as attorneys, representatives or agents for or acting on behalf of ISAC; from interfering in any way with ISAC's redirection of borrowers' payments; from transferring, encumbering, destroying, or concealing any files, books, documentation or records relating to collection of outstanding student loans placed for collection by ISAC;

from transferring, encumbering, using or collecting any assets located in the U.S. Bank Trust Account; and demanded the State Court Defendants provide a daily collections report from July 1, 2006.

(8) On October 6, 2006, F&W opened a new account at LaSalle Bank entitled "Friedman & Wexler LLC, People of the State of Illinois Account" (the "LaSalle Account"), and began depositing ISAC funds into the LaSalle Account that same day. Included in the deposits were new payments received on behalf of ISAC.

(9) On November 9, 2006 the State Court Defendants filed a counter-complaint in the State Action, seeking: an injunction to prevent ISAC from disbursing funds collected on files worked on by F&W; a declaration of rights under the Service Agreement; adjudication of attorney's statutory liens on funds collected by ISAC on delinquent accounts and a retaining lien on files; an accounting of collected funds; breach of contract damages; damages arising out of interference with contract and intentional interference with prospective advantage; and *quantum meruit*.

(10) On May 22, 2007, the State Court ordered F&W to restore to the LaSalle Account "all funds collected from ISAC Debtors and transferred to the other accounts" by May 25, 2007. The State Court also found that F&W had withdrawn nearly $1 million of funds from the LaSalle Account and transferred those funds into their general operating account. At the time of the order, F&W's general account only had around $4,000 in it.

(11) On June 14, 2007, the State Court ordered the State Court Defendants to provide a detailed accounting to ISAC for the period of August 2003 through June 14, 2007, and to "deposit all funds received from debtors or their employers in the LaSalle Bank Trust Account and not to withdraw any fund therefrom."

(12) On May 6, 2008, the State Court entered a contempt order against the State Court Defendants for violating the court's orders of October 5, 2006, May 22, 2007, and June 14, 2007. The order required compliance with the previously violated orders and imposed a $200 per business day fine on the State Court Defendants until they had purged themselves of contempt.

(13) On August 14, 2008, the State Court entered an order directing the State Court Defendants to restore the sum of $914,408.97 to the LaSalle Account.

(14) On November 21, 2008, the State Court ordered that the funds remaining in deposit in the LaSalle Account be transferred to a new interest bearing account at Bank of America (the "Original BoA Account") with the funds therein designated as trust funds held for the benefit of ISAC. The funds were to be held pending further order of the State Court.

(15) On December 11, 2008, the State Court ordered the State Court Defendants to produce certain documents for a court ordered accounting professional, Grant Thornton LLC ("Grant Thornton"), to review. The State Court ordered that, should the State Court Defendants have failed to produce the required documents and

4

information by December 19, 2008, the State Court Defendants were required to establish "a special escrow account" by December 23, 2008 and fund that account with the sum of $40,000. The order did not specify other terms or conditions regarding the "special escrow," other than to state that "[n]o money shall be released from the account without a court order," and that the State Court Defendants were to provide a copy of the state court order to the bank when the "escrow" was established.

(16) On April 3, 2009, the State Court again ordered the creation of an "escrow account" and the funding of that account with the sum of $40,000. The order provided that "[a]ll terms & conditions of the escrow account as set forth in the December 11, 2008 order are incorporated herein. The account shall be considered as surety in this matter." Thereafter, State Court Defendants opened an account at Citibank (the "Citibank Account") and funded it with $40,000. The account is titled "Friedman & Wexler for the use of Wexler & Wexler Escrow Account." In addition, the State Court Defendants were granted permission to restore the $914,408.97 shortfall in the original BoA Account in three equal payments of $304,802.99, with the first installment due by April 24, 2009.

(17) On April 29, 2009, the State Court ordered the State Court Defendants to be taken into custody for failing to make the April 24, 2009 installment.

(18) By close of business that same day, the State Court Defendants presented the State Court with a check for $304,802.99. The check was drawn on an F&W account, and was made payable to "The People of the State of Illinois." The State Court Defendants were then released from custody. The check was deposited in a second account at Bank of America (the "Second BoA Account").

(19) On August 31, 2009, ISAC amended the State Court Complaint in the State Action. The amended complaint included the original six counts included in the State Court Complaint and added additional counts for breach of fiduciary duty, fraud, conversions, legal malpractice, declaratory judgment concerning rights to certain fees, violations of the Recovery of Fraudulently Obtained Funds Act and violations of the Illinois Whistleblower Reward and Protection Act.

(20) On July 28, 2010, Mitchell Wexler filed a voluntary Chapter 7 bankruptcy petition in the Northern District of Illinois [Case No. 10bk33390] (the "M. Wexler Case").

(21) On August 19, 2010, the State Court entered an order of default against Norman Wexler and F&W. The State Court also ordered the State Court Defendants to pay attorneys' fees to ISAC and, upon ISAC's submission of a supplemental petition, to reimburse ISAC for fees paid to Grant Thornton.

(22) On September 8, 2010, Norman Wexler filed a voluntary Chapter 7 bankruptcy petition in the Southern District of Florida (the "N. Wexler Case").

(23) That same day, the State Court entered an order that purported to require a release of the funds in the Original BoA Account, the Second BoA Account and the

5

Citibank Account to ISAC. The order, however, made such release contingent upon "presentation to the court of the lack of interest or entitlement" in that account. In the context of the order, it appears that the State Court was unwilling to order release of the funds unless and until there had been a showing that the bankruptcy estates in the N. Wexler and M. Wexler Cases had no interest in the funds.

(24) On September 24, 2010, the State Court entered judgments against the State Court Defendants in the total amount of $23,710,715.82. Included in the judgment was an award of accounting fees paid to Grant Thornton in the amount of $150,460.50.

(25) On January 28, 2011, the court modified the automatic stay in the M. Wexler Case to allow ISAC to complete the adjudication of its claims against Mitchell Wexler.

(26) On February 11, 2011, the Bankruptcy Court for the Southern District of Florida granted ISAC's motion to transfer venue and transferred the N. Wexler Case to this court [Case No. 11bk09227].

(27) On May 11, 2011, the court modified the automatic stay in the N. Wexler Case to allow ISAC to complete the adjudication of its claims against Norman Wexler.

(28) On May 26, 2011, the State Court, in response to what was apparently an attempt by ISAC to obtain a lien in the funds in the Citibank Account by way of a citation to discover assets, entered an order stating that "the funds on deposit… at Respondent Citibank, N.A., is an escrow established by order of this court to hold funds to be applied to payment of accounting fees in this matter …." The State Court denied the citation and continued the matter for further resolution by the State Court of ISAC's then pending motion for turnover of funds.

(29) On May 27, 2011, the State Court entered an order liquidating ISAC's claims against Mitchell Wexler and entered judgment in favor of ISAC and against Mitchell Wexler in the amount of $17,485,497.70.

(30) On July 15, 2011, the State Court entered an order liquidating ISAC's claims against Norman Wexler and entered judgment in favor of ISAC and against Norman Wexler in the amount of $17,485,497.70.

DISCUSSION

As the preceding factual recitation makes clear, this matter is the continuation of years of litigation between ISAC and its former collection attorneys. The matter has been complicated by the intervening bankruptcies of the law firm and two of the principals of that firm. Nonetheless, the matter presented to the court by way of summary judgment can be summarized in a simple question: Does the F&W bankruptcy estate have any cognizable interest in the funds held in the Original BoA Account, the Second BoA Account and the Citibank Account? To answer this question, the court must first consider that standards applicable to it.

Rule 56 of the Federal Rules of Civil Procedure requires that a court "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 mandates the

6

entry of summary judgment if a party has failed to establish the existence of an element essential to the party's claim if that party would carry the burden of proof as to the element at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Delta Consulting Grp., Inc. v. R. Randle Const. Inc.*, 554 F.3d 1133 (7th Cir. 2009). Should the movant not have the underlying burden of proof in the matter, the movant must merely provide the basis for summary judgment and indicate where the non-moving party has failed to establish a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Rule 56 is made applicable in bankruptcy adversary proceedings such as the matter at bar. Fed. R. Bankr. P. 7056.

Unfortunately, however, this is not case where the standards appear to be outcome determinative. All of the parties appear to be in agreement that this question is a matter to be decided by summary judgment. The facts are what they are, and there is no genuine issue of material fact that would necessitate a trial. What the facts are, however, is the root of the problem.

Section 541(a)(1) of the Bankruptcy Code states that the "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case." In addition, section 541(d) states:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541.

If a debtor has property that it holds in trust for the benefit of another, that property is not "property of the estate" because the debtor does not have an "equitable interest" in the property. *Begier v. I.R.S.*, 496 U.S. 53, 59 (1990). The bankruptcy estate does not include property in which the debtor only holds bare legal title. *In re Marrs-Winn Co., Inc.*, 103 F.3d 584, 589 (7th Cir. 1996). Further, Congress clearly excluded any property held by the debtor in trust for another as of the filing of the petition as part of the bankruptcy estate. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.8 (1983) (citing 124 Cong. Rec. 32399, 32417 (1978) (remarks of Rep. Edwards)). Thus, the court's decision to grant or deny summary judgment turns upon a determination of whether the accounts of F&W are held on behalf of another entity. This is, however, easier said than done.

By way of explanation, the court need only direct the parties to the various, largely duplicative orders entered by the State Court in this matter. These orders, which appear in most instances to have been drafted by ISAC as the successful party, contain an unacceptable level of ambiguity when it comes to the nature of the accounts. The Citibank Account, for example, is referred to as a "special escrow," as an "escrow" and as a "surety." But in no instance that the court can locate, do the orders name the grantee expressly. Instead, the orders appear to simply require the money to be set aside and not to be accessed absent order of the State Court. As discussed below, that is simply insufficient to establish an escrow under Illinois law.

The orders themselves are not sufficiently clear to be the end of the court's inquiry in this matter. For that reason, the court must consider the larger picture. In so doing, the court must

7

consider the principals of state law invoked, and whether contextually that invocation is sufficient to deny F&W's estate any interest in the funds in the accounts.

In that context, the court now considers the now not-so-simple question, first as it pertains to the two Bank of America accounts, and then as it pertains to the Citibank Account.

A. <u>Count I – the Bank of America Accounts</u>

As noted in the factual recitation above, at the commencement of this matter there existed two accounts at Bank of America, which are the subject of this adversary complaint.

The first account, the Original BoA Account, contains what remains of the funds collected on behalf of ISAC by F&W. At the Hearing, the parties conceded that the funds in the Original BoA Account were trust funds and that the bankruptcy estate of F&W had no interest in those funds. On April 4, 2013, the court therefore entered partial summary judgment [Adv. Dkt. No. 38] in favor of ISAC on Count I of the Complaint, insofar as Count I sought determination that the funds in the Original BoA Account were not property of the bankruptcy estate of F&W. As a result, there is no further dispute regarding the Original BoA Account.

The second account, the Second BoA Account, is the account into which the $304,802.99 restoration payment was deposited on April 29, 2009. The parties remain in dispute as to the trust status of that account and those funds, and this dispute turns on elements of Illinois law. *DeKorwin v. First Nat. Bank of Chicago*, 318 F.2d 176, 178 (7th Cir. 1963) (whether a trust has been established is generally a question to be resolved under the law of the state that is the *situs* of the trust fund). If the beneficial interest in a trust is a creation under Illinois law, then an entity's ownership and right to protect its interest is subject to state law. *Am. Invs-Co Countryside, Inc. v. Riverdale Bank*, 596 F.2d 211, 215 (7th Cir. 1979). Because all of the accounts were located in Illinois, we apply Illinois law in this case. This means looking to both the orders of the State Court, and the applicable state law.

As noted above, the State Court orders with respect to this account are less than clear. On October 5, 2006, the State Court ordered that the U.S. Bank Trust Account was to remain frozen (another account, at the Amalgamated Bank of Chicago, was also ordered frozen). In an apparent attempt to protect against inappropriate access by the State Court Plaintiffs, the next day the State Court Defendants opened an account at LaSalle Bank, entitled "Friedman & Wexler LLC, People of the State of Illinois Account." The LaSalle Account was clearly intended to be a trust account. State law as it pertains to such funds is consistent with that conclusion. The funds deposited in the LaSalle Account were, by their very nature, trust funds, as they were the proceeds collected on behalf of ISAC. *See, e.g., In re Rosin*, 620 N.E.2d 368, 371–372 (Ill. 1993) (making it clear that client funds remain client funds, even if not deposited into a trust account, and that provided such funds were not converted by other means, depositing such funds into a non-trust account did not defeat the nature of funds).

On May 22, 2007, the State Court found that F&W had withdrawn nearly $1 million of funds from the LaSalle Account and transferred those funds into their general operating account. At the time of the order, F&W's general account only had around $4,000 in it. As a result, F&W was ordered to restore the withdrawn funds by May 25, 2007. The order in this regard is clear that F&W was to restore the client funds taken from the LaSalle Account – the taken funds constituting trust funds by clear application of the state law noted above. Such a restoration order comports

8

with Illinois law. *In re Comm'r of Banks and Real Estate*, 764 N.E.2d 66, 85–86 (Ill. App. Ct. 2001) (under Illinois law, courts have the power to compel a defendant to restore diverted trust funds).

Of course, the restoration funds could not have started out as ISAC client funds, or restoration would never be possible (using ISAC client funds as restoration funds would cause further need for restoration, creating a vicious cycle). So clearly the restoration funds do not start out subject to the same presumptions and safeguards as afforded client funds. Nonetheless, in the case of restored funds, the funds become part of the trust. *Id.*

Had F&W paid the restoration funds in the time period required and into the LaSalle Account (or even the Original BoA Account, given the parties' stipulation), it would appear that this inquiry would be at end. F&W did not, and, therefore, the inquiry must proceed. F&W paid the restoration funds into the Second BoA Account, however, and only after further developments. This begs the question of the Second BoA Account's nature, and whether the intervening events (between May 22, 2007 and the date the payment was deposited) had any effect on the inquiry.

The State Court Defendants, as the foregoing implies, did not make the restoration payment as initially ordered. Instead, on November 21, 2008, the State Court once again ordered the State Court Defendants to restore the funds depleted from the LaSalle Account. At the request of the State Court Defendants, the State Court allowed the restoration amount ($914,408.97) to be paid in thirds (thus three payments of $304,802.99 each). The State Court ordered that the first payment be made on or before April 24, 2009.

In keeping with past practices, however, this was not the end of it. The State Court Defendants missed the deadline. Thereafter, the State Court issued an order of contempt, under which the Wexlers were taken into custody on April 29, 2009. Not surprisingly, the Wexlers then arranged for the restoration payment to be made. A check from F&W was issued in the amount of $304,802.99, payable to the "The People of the State of Illinois," and the Wexlers were released. That check was deposited into the Second BoA Account.

The Defendant Trustees first argue that that the payment made was not a restoration payment, as it was made to secure the Wexlers' release from custody, not to restore the client funds misappropriated by F&W. Such an argument on its surface sounds plausible, but upon further consideration strains credulity. The circumstances under which the payment was made are separate and distinct from the nature of the payment. If the court accepted the argument that the circumstances control, then any payment made under threat of sanction would be made to avoid the sanction, not for the underlying purposes that the payment was ordered. This simply cannot be the case. The payment was an ordered restoration payment. That, in making the payment, the Wexlers were able to shorten their incarceration does not change the true purpose for which the payment was ordered. It was and remains a restoration payment, and such payments when made, constitute trust funds to the same nature and extent of the depleted funds.

The Defendant Trustees also argue that none of the applicable State Court orders regarding the restoration were final given that judgment had not been rendered, and thereby, apparently, the restoration funds remained the property of F&W. To accept such an argument, the court would have to accept the consequences of such an argument: that funds that are unquestionably trust funds – though funds against which a party has asserted a claim – can never be restored after conversion until the asserted claim has been adjudicated. Again, that simply cannot be the case. Restoration of

9

trust funds is simply a remedy to restore the status quo. It is tautological that the funds being restored are trust funds, and therefore preservation of the status quo demands that the restoration funds be equally so, even absent a final judgment on the underlying dispute.

Last, the Defendant Trustees argue that the deposit of the restoration funds into the Second BoA Account defeats the trust nature of the funds. As noted above, it is not the nature of the account, *per se*, but the nature of the funds that controls. *Rosin*, 620 N.E.2d at 371–372. Under *Rosin*, absent conversion, the monies restored to the trust become part of the trust regardless of whether they are held in a separate account.

The record reflects that the Original BoA Account was opened pursuant to a court order requiring that the account bear interest. However, the Original BoA Account was not an interest-bearing account. F&W then opened the Second BoA Account to comply with the State Court's order that the account bear interest. Otherwise the two accounts are essentially the same. Compliance with the October 5, 2008 order does not, in this court's opinion, defeat the restoration nature of the funds, and such restoration funds are trust funds. *Comm'r of Banks and Real Estate*, 764 N.E.2d at 85–86.

For that reason, the court will enter judgment in favor of ISAC on the remaining aspects of Count I in the Complaint.

B.    Count II – the Citibank Account

The status of the Citibank Account presents a different, but related issue. In the court's view, however, it is a difference with a distinction.

As with the Bank of America accounts, the Citibank Account was created pursuant to orders of the State Court. On December 11, 2008, in the context of fees being generated by Grant Thornton, the accounting firm that the State Court ordered review Freedman & Wexler's disclosures, the State Court ordered that, if certain conditions were met, the State Court Defendants were required to establish "a special escrow account" and fund that account with the sum of $40,000. The order did not specify other terms or conditions regarding the "special escrow," other than to state that "[n]o money shall be released from the account without a court order." On April 3, 2009, the State Court again ordered the creation of an "escrow account" and the funding of that account with the sum of $40,000. The order provided that "[a]ll terms & conditions of the escrow account as set forth in the December 11, 2008 order are incorporated herein. The account shall be considered as surety in this matter." Thereafter, the State Court Defendants opened the Citibank Account and funded it with $40,000. The account is titled "Friedman & Wexler for the use of Wexler & Wexler Escrow Account."

As with the trust analysis above, the court applies Illinois law. As with the trust analysis, the court looks to both the orders of the State Court, and the applicable state law.

As before, the State Court orders are of little use. It is clear in a larger context that the funds in the Citibank Account were intended to be a source of assurance – a surety as stated by the State Court – that the fees of Grant Thornton would be paid. But none of the orders state clearly that the funds were deposited to ensure that ISAC be paid for advancing Grant Thornton's fees. The December 11, 2008 order provides no parameters on the "special escrow account" other than the

10

amount for which is to be funded. The April 3, 2009 order again fails to provide any further terms regarding the "escrow account."

In fact, neither of the orders address the legal obligation for which the escrow is established, the condition under which the escrow would be released, or the identity of the grantee, promisee or obligee to whom the escrow would be released upon fulfillment of the obligation and condition. Yet these are all essential elements of Illinois escrows. *Midwest Decks, Inc. v. Butler & Baretz Acquisitions, Inc.*, 649 N.E.2d 511, 517 (Ill. App. Ct. 1995) (An escrow is a written instrument that "imports a legal obligation, and which is deposited by the grantor, promisor or obligor, or his agent with a stranger or third party, to be kept by the depository until the performance of a condition or the happening of a certain event and then to be delivered over to the grantee, promisee or obligee."). As a legal instrument establishing an escrow, neither State Court order suffices.

There is, in fact, nothing in the orders to support the conclusion that the account "was established for the specific purpose of creating a fund to reimburse ISA for the fees it paid to Grant Thornton LLP" as was pled in Count II of the Complaint. In fact, there is nothing in the orders that indicates the State Court even considered that someone might prepay Grant Thornton's fees, and then seek release of the funds. The clearer interpretation of the orders is that, if the funds were held for the benefit of anyone directly, it was for Grant Thornton.

It is true that, in subsequent orders, the State Court appeared to be prepared to release the escrowed funds to ISAC. But this was, at best, an indication of the State Court's intention to act in the future, should certain conditions be met. No action was ever taken. The procedure followed by the State Court in this matter makes it abundantly clear that further conditions needed be satisfied (including the consent of the Defendant Trustees, which consent was never given), and that the State Court anticipated further orders would be entered.

In order to defeat the interest of the Defendant Trustees, something much more definitive is necessary. Unlike the restoration funds, there is no underlying condition that supports the finding that, despite the language of the orders, the funds should nonetheless be treated as escrowed funds. The orders, as well as the express requirements of state escrow law, are all the court has to go on. In this regard, Plaintiff has failed to establish that these require the conclusion it desires.

The court has considered whether the State Court's use of the term "surety" has any independent, legal effect, but has been unable to locate any precedent that would be helpful in this regard. Plaintiff has not provided the court with any such precedent, nor advanced this argument. This latter fact essentially ends the inquiry. *See United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000) ("It is not this court's responsibility to research and construct the parties' arguments.").

The court has also considered whether the order could be considered a form of prejudgment attachment. But Illinois law does not permit equitable prejudgment attachment. *Carriage Way Apartments v. Pojman*, 172 Ill. App. 3d 827, 838 (2d Dist. 1988) ("[T]here is no such thing as equitable attachment in this State and the theory of taking away the control of a person's property by means of an injunction for the purpose of anticipating a judgment which may or may not thereafter be obtained by a litigant is abhorrent to the principles of equitable jurisdiction.") (quoting *Lewis v. West Side Trust & Savings Bank*, 288 Ill. App. 271, 278 (1st Dist. 1937)). And none of the State Court orders indicate that the specific conditions of the Illinois Attachment Act, ILCS 5/4–101, had been met.

11

It is true that the State Court did, eventually, enter judgment in favor of ISAC and that judgment included the amounts that ISAC paid to Grant Thornton. Such judgment, in and of itself, establishes no greater rights in the Citibank Account's funds than those held by any other creditor of F&W. As the State Court's orders did not establish any greater rights in the Citibank Account's funds, absent the turnover of the funds to ISAC at the order of the State Court, the only remedy available to ISAC resulting from the judgment that would have changed the court's conclusion would be if ISAC had obtained a lien by way of post-judgment attachment (including, for example, by way of a citation to discover assets). Unfortunately, the State Court denied ISAC's attempts to seek a citation lien in the Citibank Account's funds given the pending motions from ISAC to have those funds turned over to it.

As a result, ISAC is left with nothing other than a claim against the bankruptcy estates, but not specifically against the funds in the Citibank account. That means that the escrowed funds are estate funds, and ISAC's claim is, in this regard, an unsecured claim to be treated on par with the other unsecured claims against the bankruptcy estates.

ISAC has failed to establish its entitlement to the Citibank Account's funds, and Count II of the Complaint must be denied. Accordingly, the court will enter judgment in favor of the Defendant Trustees.

## CONCLUSION

For all the foregoing reasons, the court concludes that the Motion (i) can and will be granted as to Count I of the Complaint, and that summary judgment in favor of ISAC will be granted on this count, and (ii) must be denied as to Count II of the Complaint, and that summary judgment in favor of Defendant Trustees will be granted on this count.

Plaintiff ISAC, as the successful party on the Count I of the Complaint, shall present a compliant judgment order – reviewed and approved by counsel for the Defendant Trustees – to court no later than July 3, 2013.

Dated: June 19, 2013         ENTERED:

_____
Timothy A. Barnes
United States Bankruptcy Judge